JOAN E. ONOFRIO, administratrix,[1] vs. DEPARTMENT OF
MENTAL HEALTH & another.[2]

Berkshire. September 6, 1990. - November 19, 1990.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Commonwealth*, Liability for tort, Officers and employees, Duty to prevent
harm. *Negligence*, Public employee. *Massachusetts Tort Claims Act.
Actionable Tort.*

Discussion of the so-called "public duty rule" and its "special relationship"
exception, and statement that the rule, with or without its exception,
had no application in the circumstances of an action to recover for
property damage caused by a client of the Department of Mental
Health. [609-610]

In an action brought by the owner of a rooming house to recover for dam-
age to his structure and its contents caused by a fire set by a client of
the defendant (Department of Mental Health) who had been placed by
the defendant's employees in the plaintiff's house and maintained there
without their providing the plaintiff with sufficient information to en-
able him to protect his property, the judge, in imposing liability on the
department on account of the negligence of its employees, properly con-
cluded that the defendant's employees owed the plaintiff a duty of rea-
sonable care where, by taking action that exposed the plaintiff to risk,
the defendant's employees were bound to act reasonably; moreover, the
department was not immune from liability, by virtue of G. L. c. 258, §
10 (*b*), where the conduct the judge found to have been negligent was
not the exercise of choice regarding public policy and planning but, in-
stead, was the negligent carrying out of previously established policies
or plans. [610-612]

There was no merit to the contentions by a charitable organization that, by
placing a client of the Department of Mental Health in a certain house,
pursuant to its contract with the department to find short-term housing
for persons referred by the department, the charitable corporation en-
gaged in a purely gratuitous undertaking and that, consequently, when
the client set a fire destroying the rooming house and its contents, the

---

[1] Of the estate of Patrick J. Onofrio.

[2] Meridian Associates for Programs and Resources, Inc.

charitable corporation could not be liable in the absence of gross negligence. [612]

In an action brought by the owner of a rooming house to recover for damage to his structure and its contents caused by a fire set by a client of the Department of Mental Health who, pursuant to the department's contract with a certain charitable corporation, was found short-term housing in the rooming house by the charitable corporation, the judge was warranted in concluding without expert testimony that the charitable corporation reasonably should have known about the importance to the plaintiff of information concerning the client's mental health history. [612-613]

CIVIL ACTION commenced in the Superior Court Department on August 21, 1984.

The case was heard by *Charles R. Alberti*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Patricia T. Martinelli*, Special Assistant Attorney General, for Department of Mental Health.

*Michael K. Manning*, for Meridian Associates for Programs and Resources, Inc.

*David O. Burbank* for the plaintiff.

O'CONNOR, J. This action was brought by Patrick J. Onofrio (Onofrio), now deceased, to recover for property damage to his house and its contents caused by a fire set by a client of the defendant Department of Mental Health (DMH). The case was tried before a judge of the Superior Court sitting without a jury. Judgment was entered in the sum of $100,000 against DMH and $20,000 against Meridian Associates for Programs and Resources, Inc. (Meridian) (see G. L. c. 23, § 85K [1988 ed.], limiting tort liability of charitable corporations). Both defendants have appealed. We transferred the case from the Appeals Court on our own initiative. We affirm both judgments.

We set forth the judge's relevant findings. Onofrio purchased a twelve-room house in Pittsfield in 1980. In 1983, DMH and Meridian were parties to a contract that called for Meridian to find short-term housing for persons referred by

DMH. The persons to be referred consisted of individuals "recently discharged [or] in danger of hospitalization or those requiring tracking to maintain themselves." On October 7, 1983, DMH requested that Meridian find short-term housing for John Burgess, and on October 13, Meridian placed Burgess in Onofrio's house. Onofrio had been operating the house as a rooming house since the previous month. DMH was promptly notified of the placement. Burgess was residing at the house when he set a fire on October 28 that destroyed the house and its contents.

Burgess had become a client of DMH in January, 1983. When Meridian placed Burgess in Onofrio's house, Onofrio was not told that Burgess was a DMH client nor was he told about any emotional or other problems that Burgess might have had except that he "drank a little." On his third or fourth night in the house, Burgess created a disturbance as a result of which Onofrio attempted to evict Burgess. However, Onofrio abandoned that effort when he was advised that he could not evict Burgess without a court order. Onofrio then told Meridian that he did not want Burgess in his house, and Meridian referred Onofrio to Mark Keller, who was a staff clinical social worker at DMH. Onofrio attempted to talk with Keller on the telephone, but Keller never returned his calls. The judge found that Onofrio had never knowingly accepted referrals from DMH because he "was not organized to cope with anything like that."

According to the judge's findings, Keller's responsibilities at DMH included acting as a liaison between DMH and Meridian. He also prepared individual treatment plans for DMH clients. Keller was responsible for Burgess. As early as January, 1983, Keller knew the contents of Burgess's file, which included incidents of destruction of property, violence, and fire setting, although the only documented fire setting incident had occurred in 1975. A 1975 report stated that Burgess was "periodically preoccupied with fire as a means of destroying those with whom he is angry." Keller was informed that, on March 7, 1983, while residing at an emergency shelter for youths, Burgess set off three false fire

alarms, and set off another one on March 11. In June, 1983, Keller was told about a physical confrontation between Burgess and an elderly man and in September Keller learned that Burgess had been arrested for breaking and entering.

Because Burgess was unwilling to accept services or treatment offered by DMH, DMH placed Burgess's case on inactive status on October 3, 1983. Keller continued to be informed of Burgess's activities, however. On October 4, Keller learned that Burgess had kicked in a woman's door and punched a police officer, and that Burgess had been admitted to an alcohol detoxification center but refused to stay.

Burgess was referred to Meridian by a DMH supervisor (not Keller). When the referral was made, the supervisor was unaware of Burgess's history, and the referral form did not mention it. Burgess's records were not forwarded to Meridian at any time before the fire. The judge's memorandum of findings and rulings states as follows: "In the past Burgess had signed waivers at Keller's request enabling DMH to provide his records and history to at least three other agencies providing treatment or services. Some time before October 28, 1983, Keller told a representative of Meridian that she could read Burgess's record after a waiver had been signed. No waiver was ever signed for Meridian or Onofrio; no evidence [was] presented that one was ever asked for. Onofrio *could* have, if informed even generally of a potential problem, insisted that Burgess agree to release his records as a precondition to being allowed to reside in Onofrio's rooming house. Onofrio was kept so completely in the dark about Burgess that he had no reason to expect that Burgess was in any way associated with DMH until after Burgess was placed in his rooming house." (Emphasis in original.)

The judge concluded that, due to a "special relationship" between DMH and Onofrio, DMH owed Onofrio a duty of reasonable care which DMH failed to meet by keeping him "completely in the dark," and that the fire happened as a result of such negligence. He found Meridian negligent as well, rejecting, among other contentions, Meridian's argument that it did not owe Onofrio a duty of reasonable care

because Meridian did not have a business relationship with Onofrio.

Having recited the relevant findings, we first direct our attention to DMH's arguments on appeal, and then to Meridian's. At the trial, DMH argued, and argues here, that, by virtue of the so-called "public duty" rule, DMH's employees for whose conduct Onofrio seeks to hold DMH responsible, owed no duty to Onofrio. As a result, DMH argues, Onofrio failed as a matter of law to establish any negligence for which DMH would be liable.

The public duty rule holds that the employment duties of public employees are generally owed only to the public as a whole and not to private individuals. There is an exception to the public duty rule, however, when there is a "special relationship" between the public employee and certain individual members of the public. We have discussed the public duty rule and its exception and the criteria for determining when a special relationship exists in *A.L.* v. *Commonwealth*, 402 Mass. 234 (1988), *Appleton* v. *Hudson*, 397 Mass. 812 (1986), *Nickerson* v. *Commonwealth*, 397 Mass. 476 (1986), *Ribeiro* v. *Granby*, 395 Mass. 608 (1985), *Irwin* v. *Ware*, 392 Mass. 745 (1984), and *Dinsky* v. *Framingham*, 386 Mass. 801 (1982). DMH and Onofrio devote considerable attention in their briefs, as did the judge in his memorandum of findings and rulings, to the question whether the public duty rule or, instead, its "special relationship" exception governs this case. We agree with the judge's ultimate conclusion that DMH's employees owed Onofrio a duty of reasonable care. However, as we discuss below, we do not agree that the basis of such a duty is the existence of a special relationship and consequent exception to the public duty rule.

The public duty rule, with or without its special relationship exception, has no application to a case of this kind. The rule applies only to situations, like those present in *Irwin* v. *Ware*, *supra*, and its progeny, in which a plaintiff has been directly harmed by the conduct of a third person and only indirectly by a public employee's dereliction of a duty — a duty imposed on him solely by his contract of employment —

to interrupt or prevent the third person's harmful activity. If, in *Irwin*, the injuries and deaths had been directly caused by the police officer's negligent driving of a cruiser in the course of his employment, there would have been no call for this court to indulge in an analysis involving the public duty rule and its exceptions. In such a case, the duty owed by the police officer would not have been grounded in his employment contract but rather would have been the duty of care that every motorist owes to every one else on the highway. See generally Glannon, The Scope of Public Liability Under the Tort Claims Act: Beyond the Public Duty Rule, 67 Mass. L. Rev. 157, 166 (1982).

The present case does not invoke a public duty rule kind of analysis. The DMH employees did not simply fail to protect Onofrio from Burgess's conduct in violation of an employment responsibility to keep dangerous persons out of citizens' homes. That is, they did not violate a public duty, and therefore the question whether, by doing so, they also violated a duty to private individuals with whom they had a special relationship is not present. Rather, the employees directly contributed to cause Onofrio's loss by soliciting Burgess's placement in Onofrio's house and maintaining him there without taking reasonable measures to provide Onofrio with sufficient information to enable him to protect his property. The DMH employees owed Onofrio a duty of care, not because they were employed to protect persons such as Onofrio and failed to do so, but because, by taking action that exposed Onofrio to risk, they were bound, as any other person would be, to act reasonably. The employees' duty was no different than it would have been had the employees been acting merely as private individuals. Their duty is grounded in the general rule that one who takes action ordinarily owes to everyone else who may be affected thereby a duty to act reasonably.

DMH's next contention is that it is immune from liability because, by virtue of G. L. c. 258, § 10 (*b*) (1988 ed.), the waiver of immunity otherwise provided by c. 258 does not apply. Section 10 (*b*) provides as follows: "The provisions of sections one to eight, inclusive, shall not apply to . . . any

claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused . . . ." DMH's position is that "the decision of its employee Keller not to ask Burgess for a release [of his privileged mental health records] or to warn Onofrio of Burgess'[s] prior problems is a discretionary act within the meaning of § 10 (*b*) and that the court's contrary conclusion is based upon an error of law." We do not agree.

The Legislature enacted G. L. c. 258, § 10 (*b*), following this court's decision in *Whitney* v. *Worcester*, 373 Mass. 208 (1977), and we have consistently looked at the principles enunciated in *Whitney* to determine the intended scope of this statutory provision. See *A.L.* v. *Commonwealth, supra* at 245; *Patrazza* v. *Commonwealth*, 398 Mass. 464, 467 (1986); *Irwin* v. *Ware, supra*. In *Whitney, supra* at 218, we concluded that "[w]hen the particular conduct which caused the injury is one characterized by the high degree of discretion and judgment involved in weighing alternatives and making choices *with respect to public policy and planning*, governmental entities should remain immune from liability . . . . On the other hand, when the particular conduct claimed to be tortious involves rather the carrying out of previously established policies or plans, such acts should be governed by the established standards of tort liability applicable to private individuals or entities and the governmental entity in question held liable for the injuries resulting from such acts." (Emphasis added.) We recognized that "[t]he line to be drawn cannot merely be one between functions which involve discretion and judgment and those which do not, for the performance of all functions involves the exercise of discretion and judgment to some degree." *Id.* at 219. It is clear from the judge's memorandum of findings and rulings that the conduct he found to have been negligent was not the exercise of choice regarding public policy and planning but, instead, was the negligent carrying out of previously established policies or plans.

Finally, DMH argues that it cannot be held liable for the negligence of Meridian's employees because, under G. L. c. 258, § 2 (1988 ed.), a public employer may only be held liable for the negligence of public employees. Meridian's employees, of course, are not public employees. DMH's argument seems to assume that the judge imposed vicarious liability on DMH for the negligence of Meridian's employees. That assumption is incorrect. The judge imposed liability on DMH on account of the negligence of DMH's employees. There was no error.

We come now to Meridian's arguments, of which there are two, neither of which, in our view, has merit. The first argument is that the judge erred in "finding" that Meridian and Onofrio had a business relationship. Meridian says that, by placing Burgess in Onofrio's rooming house, Meridian engaged in a purely gratuitous undertaking with the result that Meridian could not be liable in the absence of gross negligence. See *Bagley* v. *Burkholder*, 337 Mass. 246, 248 (1958); *Massaletti* v. *Fitzroy*, 228 Mass. 487, 506, 510 (1917). We think it is clear from the judge's findings, which were warranted by the evidence, that, in placing Burgess in Onofrio's house, Meridian was furthering its own business interests flowing from its relationship with DMH. "To impose liability for ordinary negligence, it is only necessary for a [judge or] jury to find some business advantage to the defendant." *Beaulieu* v. *Lincoln Rides, Inc.*, 328 Mass. 427, 429 (1952).

Meridian's second argument is that the evidence was insufficient to warrant the judge's finding that, in the exercise of reasonable care, Meridian should have foreseen and responded to Onofrio's need for information about Burgess's mental health history. In this connection, Meridian asserts that the judge's finding that "Meridian should have known that the DMH clients it served were potentially problematic" was unwarranted in the absence of expert testimony to that effect. To dispose of this argument, it would be enough for us to observe that Meridian does not appear to have made the same argument in the trial court, and it is too late to do so

for the first time on appeal. In any event, even if the issue were properly here, the result would be the same. Clearly, expert testimony is not a prerequisite to a finding about matters that are within ordinary human experience. That DMH clients, who are "recently discharged [or] in danger of hospitalization or . . . requir[e] tracking to maintain themselves," as provided in Meridian's contract with DMH, are "potentially problematic," especially for those who would offer such persons housing, is such a matter. The judge was warranted in concluding without expert testimony that Meridian reasonably should have known about the importance to Onofrio of information concerning Burgess's mental health history.

*Judgments affirmed.*