PAUL COUGHLIN, administrator, & others[1] vs. DEPARTMENT OF CORRECTION & others.[2]

No. 96-P-423.

Suffolk. June 13, 1997. - November 14, 1997.

Present: BROWN, GREENBERG, & FLANNERY, JJ.

*Practice, Criminal,* Dismissal. *Civil Rights,* Availability of remedy. *Massachusetts Tort Claims Act. Governmental Immunity. Commonwealth,* Claim against, Liability for tort. *Wrongful Death.*

A Federal civil rights claim brought against certain Commonwealth agencies and employees did not allege facts stating a claim for relief under 42 U.S.C. § 1983, and a Superior Court judge correctly dismissed that claim. [812-814]

In a wrongful death claim brought against certain Commonwealth agencies and employees under the Massachusetts Tort Claims Act, G. L. c. 258, the judge erred in dismissing the complaint pursuant to Mass. R. Civ. P. 12 (b)(6), where the complaint, read in the light most favorable to the plaintiff, fairly alleged negligent carrying out of previously established agency policies or plans, thus precluding a finding that, as matter of law, the claim was barred by the discretionary function exception set forth in G. L. c. 258, § 10(*b*). [814-817]

CIVIL ACTION commenced in the Superior Court Department on February 10, 1995.

A motion to dismiss was heard by *Gordon L. Doerfer,* J., and a motion for entry of separate and final judgment was heard by *Peter M. Lauriat,* J.

---

[1]Paul and Karen Coughlin.

[2]Department of Mental Health, Executive Office of Public Safety, Executive Office of Health and Human Services, the Restrictive Integration Review Board. The complaint also names as defendants the various commissioners or secretaries of the departments and executive offices during the time pertinent to the complaint in both their individual and official capacities. Also named are three members of the Restrictive Integration Review Board who voted for Michael Kelley's release: Robert F. Moore, Judith Power, and Julie Mack; and Dr. Robert Prentky who recommended Michael Kelley's release.

*Robert J. Harrington* for Paul Coughlin.

*Leslie B. Greer,* Assistant Attorney General, for the Department of Correction & others.

BROWN, J. The plaintiff, Paul Coughlin, administrator of the estate of his daughter, Colleen Coughlin, asserts wrongful death and Federal civil rights claims against various Commonwealth agencies and employees after Colleen was murdered in April, 1992, by Michael Kelley, a twice convicted rapist who had been paroled by the Department of Correction.[3] A judge of the Superior Court allowed the defendants' motion to dismiss pursuant to Mass.R.Civ.P. 12(b)(6), 365 Mass. 755 (1974), concluding that the wrongful death claims were barred by the "discretionary function" exception of the Massachusetts Tort Claims Act, see G. L. c. 258, § 10(*b*), and that the civil rights claims lacked the requisite "State action" required by 42 U.S.C. § 1983 (1994). Coughlin appealed. We reverse in part.

At this preliminary stage, we think that the complaint fails to make out a viable § 1983 claim against any defendant, but think the wrongful death claims do state grounds upon which relief could be granted; to wit, that certain nondiscretionary and negligent conduct caused Colleen's death.

In the complaint, the plaintiff alleges that in 1978, Kelley, a twice convicted rapist was confined to the Massachusetts Treatment Center for Sexually Dangerous Persons (center) at Bridgewater where he remained in the dual custody and control of the Department of Correction (DOC) and the Department of Mental Health (DMH). During his commitment to the center, Kelley is alleged to have engaged in numerous illicit activities, including sexual offenses and drug offenses. These acts occurred at the center, at the halfway house associated with the center, and while Kelley was on a community work release program.

The plaintiff alleges that the DOC and DMH were in a power struggle for control over the center. As a result, the DOC allegedly incited violence and drug use in the center to justify the correctional use of the facility. At the same time, to justify its oversight of the center, the DMH falsely claimed that inmates had been successfully treated and rehabilitated. The plaintiff al-

---

[3]Paul and Karen Coughlin, Colleen's parents, also brought separate loss of consortium claims which they voluntarily dismissed. On appeal, the plaintiff has expressly waived State civil rights claims.

leges that the Executive Office of Public Safety and the Executive Office of Health and Human Services were aware of, but did nothing to alleviate, the dangers resulting from the dual control of the center, and further contends that those agencies did not adequately train or supervise the center's employees and consultants.

In June, 1991, pursuant to G. L. c. 123A, § 8,[4] a Restrictive Integration Review Board (RIRB), was organized to review Kelley's treatment, danger to the community, and possible release as no longer a sexually dangerous person. The RIRB consisted of the defendants, Robert Moore, M.D., Julie Mack, Ph.D, Judith Power, and two other individuals. The plaintiff alleges that the meeting was organized by Drs. Robert Prentky and Theoharis Seghorn for the purpose of expediting Kelley's release in order to prevent Federal, State, and local law enforcement agencies, who were investigating criminal activities in the Bridgewater area (perpetrated perhaps by Kelley or other work release participants), from learning of the center's responsibility for the activities being investigated. The plaintiff also contends that the RIRB was improperly constituted because it consisted of five members instead of the statutorily mandated six, and that no DOC representative was present; he claims this made a difference because the board voted three to two to recommend that Kelley be found no longer a sexually dangerous person.[5]

The plaintiff further alleges that the recommendation to release Kelley was made even though the center, contrary to regulations, had never evaluated or completed an annual report on Kelley. Moreover, the RIRB made the recommendation despite knowledge that three weeks prior to its meeting, Kelley had been found with a fourteen-inch knife, barber scissors, rope, unauthorized credit cards, and an excessive amount of money. This information was not contained in the RIRB's findings.

The RIRB's findings were presented to the Superior Court as part of a petition for Kelley's release. See G. L. c. 123A,§ 9. Kelley is alleged to have retained New England Forensic, Inc.,

---

[4]Effective April 14, 1994, this section was repealed by St. 1993, c. 489, § 5.

[5]The motion judge's decision indicates that the board's vote was unanimous, which is contrary to the allegation in the complaint.

and Dr. Seghorn[6] to evaluate him. Dr. Seghorn represented to the Superior Court that Kelley was no longer a sexually dangerous person, and the judge ordered Kelley released. Kelley then was held in a DOC correctional facility until he was paroled by the Massachusetts Parole Board in October, 1991. While at the correctional facility, Kelley is alleged to have attempted suicide and exhibited bizarre behavior.

Following his parole, Kelley obtained employment through a program sponsored by the DMH at a sign company situated next door to the residence of Colleen Coughlin. The DMH had assisted Colleen in obtaining housing there. On April 13, 1992, approximately five months after Kelley had been paroled, he killed Colleen. In September, 1994, Kelley pleaded guilty to murder in the first degree.

We review the judge's dismissal of the plaintiff's complaint "in light of the principles that: (a) the allegations in the complaint, as well as such reasonable inferences as may be drawn therefrom in favor of [the plaintiff], are to be taken as true, and (b) a complaint is sufficient 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Eyal* v. *Helen Bdcst. Corp.*, 411 Mass. 426, 429 (1991) (citations omitted).

1. *42 U.S.C. § 1983 claims.* We agree with the judge that the facts as alleged in the complaint and any reasonable inferences therefrom do not state a claim for relief under 42 U.S.C. § 1983.[7]

"A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law . . .; second, the conduct must have worked a denial of rights secured by the Constitution or by federal law." *Soto* v. *Flores*, 103 F.3d 1056, 1061 (1st Cir.), cert. denied, 118 S. Ct. 71 (1997). Where, as here, Colleen's death directly resulted from Kelley's actions, not those of a State actor, the plaintiff faces a thorny problem because "nothing in the language of the Due

---

[6]Both originally were named as defendants, but they now have settled with the plaintiff and are not parties to this appeal.

[7]"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney* v. *Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 195 (1989).

The plaintiff, however, points to two exceptions to the general rule that the Commonwealth owes no constitutional duty to protect a citizen from harm at the hands of a private actor. A court may find State action where State actors "conspire with criminals or madmen, or intending to harm the victim, deliberately release a criminal or madman." *Estate of Gilmore* v. *Buckley*, 787 F.2d 714, 720 n.10 (1st Cir.), cert. denied, 479 U.S. 882 (1986). Although the plaintiff has categorized the decision to release Kelley as a "conspiracy" to prevent investigation of the center, it has not been made to appear that the State actors conspired *with* Kelley or that any State actor intended that Colleen would be harmed.

The plaintiff also argues that the second exception discussed in *Estate of Gilmore*, applies, namely that a plaintiff may maintain a § 1983 claim if there is a " 'special relationship' between the state and the plaintiff giving rise to an affirmative duty of care or protection under the fourteenth amendment." *Id.* at 720. The plaintiff argues that a "special relationship" was created when the DMH assisted her in finding housing next door to the company that Kelley had been referred to by the DMH.

In *Estate of Gilmore*, the First Circuit, noting that a "special relationship" usually denotes a custodial relationship, found the "door slightly ajar" in a situation where the State actors who had released a prisoner on furlough knew or should have known that he "posed a special danger to [the victim], as distinct from the public at large." *Id.* at 721. The court, however, concluded that "the state did nothing to render [the victim] any more or less capable of defending herself from a violent attacker than any other member of the general public. Furthermore, even though [the killer] was legally in state custody while on furlough, [he] was in no sense an agent of the State. The state played no part in creating the threat that [he] posed to [the victim], [his] murderous design was independently conceived and executed, and the state neither condoned nor encouraged his behavior." *Id.* at 721-722. The First Circuit concluded: "Because there was no special relationship of constitutional dimension between [the victim] and the state, we hold that the

plaintiff has failed to make out a violation of the fourteenth amendment and a claim under section 1983."[8] *Id.* at 722.

The viability of this kind of "special relationship" analysis appears suspect after *Deshaney* v. *Winnebago County Dept. of Social Servs., supra,* where the Supreme Court said: "[I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf — through incarceration, institutionaliza- tion, or other similar restraint of personal liberty — which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to protect his liberty interests against harms inflicted by other means." 489 U.S. at 200. In this case, there is no suggestion that the DMH, by assisting Col- leen in locating housing, in any sense deprived her of her freedom to act on her own behalf. See *Monahan* v. *Dorchester Counseling Center, Inc.,* 961 F.2d 987, 991 (1st Cir. 1992) (relying on *Deshaney,* court held that State did not assume the constitutional duty to protect a mentally ill patient who *voluntar- ily* committed himself).

In short, the plaintiff's complaint does not establish a "special relationship of constitutional dimension" and therefore fails to state a claim for relief under 42 U.S.C. § 1983.[9]

2. *Claims under the Massachusetts Tort Claims Act.* Wrong- ful death claims, see G. L. c. 229, § 2, may be made against the Commonwealth under the Massachusetts Tort Claims Act, G. L. c. 258. See *Kromhout* v. *Commonwealth,* 398 Mass. 687 (1986). General Laws c. 258, § 2, as inserted by St. 1978, c. 512, § 15, provides that "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances."

An exception to liability exists, however, if the claim is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part

---

[8]We note in passing that the plaintiff's complaint does not allege that Kelley was a State agent or that any State actor encouraged or condoned the killing or knew that Colleen was more at risk than any other member of the public.

[9]The plaintiff points to no case where a court has found a "special relation- ship" on analogous facts.

of public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused." G. L. c. 258, § 10(*b*), as inserted by St. 1978, c. 512, § 15. The motion judge was of the opinion that the Commonwealth's conduct that allegedly caused Colleen's death fell within this discretionary function exception to the Massachusetts Tort Claims Act as a matter of law. The judge concluded that the basis of the wrongful death action was the RIRB's decision to recommend that Kelley no longer be considered a sexually dangerous person and the resulting decision to release him. He took the position that these decisions "clearly involve policymaking, a function which has largely been delegated to the executive branch."

"In *Harry Stoller & Co.* v. *Lowell*, 412 Mass. 139 (1992), the Supreme Judicial Court set out a two-part test for determining whether a plaintiff's claim for negligent conduct on the part of the Commonwealth . . . was barred by c. 258, § 10(*b*). The first step is to 'determine whether the governmental actor had any discretion at all as to what course of conduct to follow.' *Id.* at 141. If the allegedly tortious action was prescribed by statute or regulation, or established agency practice, then the governmental actor had no discretion to exercise, and § 10(*b*) immunity would not apply. *Ibid.* If, on the other hand, the particular actions were not so prescribed, the complained of actions would involve some amount of discretion. Under part two of the *Stoller* test, the issue then becomes a question whether the discretion exercised rises to the level of policy-making or planning, as that is the only type of discretion immunized by § 10(*b*). *Ibid.*" *Alake* v. *Boston*, 40 Mass. App. Ct. 610, 611-612 (1996).

In allowing the Commonwealth's rule 12(b)(6) motion to dismiss, we think the judge erred by reading the plaintiff's complaint narrowly and thus too readily concluding that the Commonwealth satisfied the first part of the *Stoller* test. The complaint alleges that there are specific statutes, rules, regulations, and practices governing the center in general and the RIRB decision-making process in particular. For example, the complaint alleges that the center failed to evaluate Kelley as required and did not include in its findings important information about the recent discovery of contraband on Kelley's person. The complaint further alleges that the RIRB was improperly constituted and did not include input from the DOC

as required.[10] Reading the complaint in the light most favorable to the plaintiff, it can fairly be said that it alleges the "negligent carrying out of previously established policies or plans," *Onofrio* v. *Department of Mental Health*, 408 Mass. 605, 611 (1990), thus precluding finding the discretionary function exception as matter of law.[11]

Further, the complaint implies a theory of negligence based on the failure of DMH to use reasonable care by placing Kelley at a job site next door to housing it had found for Colleen (and perhaps other DMH clients). Given that the Commonwealth is alleged to have known about Kelley's dangerous activities while on a work release program, a question is raised as to whether DMH's placement of Kelley exposed Colleen to risk and thus, whether the DMH was "bound, as any other person would be, to act reasonably." *Id.* at 610. Cf. *Bonnie W.* v. *Commonwealth*, 419 Mass. 122, 126 (1994) (plaintiff could proceed on theory that probation officer negligently recommended hire of

---

[10]It may be that the plaintiff will have a difficult time establishing that these acts or omissions caused Colleen's death, but that is a factual determination which cannot be resolved on a rule 12(b)(6) motion.

[11]A wrinkle arises, however, due to the 1993 amendments to c. 258, § 10 — St. 1993, c. 495, § 57 — which added subsections (*e*) - (*j*) and the caveat: "Nothing in this section shall be construed to modify or repeal the applicability of any existing statute that limits, controls or affects the liability of public employers or entities." Of particular importance to this case is § 10(*i*) which immunizes the Commonwealth from liability for "an [*sic*] claim based upon the release, parole, furlough or escape of any person, including but not limited to a prisoner, inmate, detainee, juvenile, patient or client, from the custody of a public employee or employer or their agents, unless gross negligence is shown in allowing such release, parole, furlough or escape." But see *Jean W.* v. *Commonwealth*, 414 Mass. 496, 510 (1993) (Liacos, J., concurring).

One commentator who participated in the committee discussions on the amendment has said: "If the claim is that an offender *should not be released* because he or she remains dangerous, this would be governed by subsection (i). Recovery could be had if gross negligence is shown." (Emphasis original) Glannon, Liability for "Public Duties" Under the Tort Claims Act, 79 Mass. L. Rev. 17, 31 (1994). On the limited record before us, we do not reach the issue whether § 10(*i*) applies to the facts of this case. We decline also to discuss the interaction of the specific exemption in § 10(*i*) with the more general "discretionary function" exemption contained in § 10(*b*) (i.e., whether § 10(*i*) creates liability for gross negligence in the release of a prisoner even when that act is discretionary or whether § 10(*i*) imposes an additional requirement of gross negligence for even nondiscretionary acts leading to the release of a prisoner). We note, however, that even if § 10(*i*) was applicable, the complaint, fairly read, asserts conduct by Commonwealth employees which could rise to the level of gross negligence.

probationer at a mobile home park where he could have access to residents' homes).[12]

As in *Lawrence* v. *Cambridge*, 422 Mass. 406, 412 (1996), the lack of discovery here results in "[t]he case com[ing] to us in an unfortunately abstract posture." "The lower court, as well as this court, would have been aided greatly if the parties had elevated this matter to another rung on the procedural ladder by filing affidavits and other appropriate materials to bring it within the more efficacious purview of a summary judgment proceeding. See Mass.R.Civ.P. 56, 365 Mass. 824 (1974)." *Kirkland Constr. Co.* v. *James*, 39 Mass. App. Ct. 559, 564 (1995) (Brown, J., concurring). Especially in a wrongful death case where many relevant facts may not be known to the plaintiff (as administrator of an estate), not allowing the opportunity for discovery seems especially inequitable. The plaintiff is entitled to engage in discovery to develop further his theories of negligence.

The judgment is reversed as to the counts alleging wrongful death. The judgment is otherwise affirmed. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[12]The complaint does not allege that Kelley was under State supervision (by a parole officer or otherwise) at the time of the murder.