SUPREME JUDICIAL COURT 
 
 MATTHEW THEISZ vs. MASSACHUSETTS BAY TRANSPORTATION AUTHORITY

 
 Docket:
 SJC-13624
 
 
 Dates:
 December 4, 2024 - March 14, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, & Wendlandt, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Massachusetts Tort Claims Act. Assault and Battery. Bus. Massachusetts Bay Transportation Authority. Public Employment. Labor, Public employment. Negligence, Employer, Vicarious liability. Immunity from Suit.
 
 

      Civil action commenced in the Superior Court Department on September 28, 2016.
     The case was heard by Catherine H. Ham, J., on a motion for
summary judgment.
     After review by the Appeals Court, 103 Mass. App. Ct. 822 (2024), the Supreme Judicial Court granted leave to obtain further appellate review.
     Jennifer M. Lee Sage (John J. Bonistalli also present) for the defendant.
     David H. Rich (Frank J. Federico, Jr., also present) for the plaintiff.
     Jeffrey R. White, of the District of Columbia, Marc A. Diller, Thomas R. Murphy, Kevin J. Powers, Lucas J. Newbill, & Patricia J. Rezendes, for Massachusetts Academy of Trial Attorneys & another, amici curiae, submitted a brief.
     Maura E. O'Keefe, Town Counsel, for Massachusetts Municipal Lawyers Association, amicus curiae, submitted a brief.
     WENDLANDT, J.  In this case, we address the question whether the Massachusetts Bay Transportation Authority (MBTA) is immune from liability under G. L. c. 258, § 10 (j) (§ 10 [j]), of the Massachusetts Tort Claims Act (MTCA or statute), G. L. c. 258, for its negligence in hiring, promoting, retaining, and supervising its own employee -- a bus driver, who had a known history of anger management issues that included a prior assault against a passenger -- when the MBTA placed the driver in a public-facing position and the driver assaulted an MBTA customer, the plaintiff Matthew Theisz.  We conclude that § 10 (j) provides no protection to the MBTA for its own misfeasance in these circumstances.  
     Subject to delineated exceptions not relevant here, § 10 (j) generally provides public employers immunity from liability for a plaintiff's harm directly caused by the tortious conduct of a third person or by a private or naturally occurring risk.  More specifically, the provision protects a public employer from being held to account for the conduct of public employees who negligently fail to act, or negligently act, to prevent such private risks unless public employees affirmatively engaged in conduct that materially contributed to the condition or situation resulting in the plaintiff's harm.  The provision has no application where, as alleged here, a plaintiff has been directly injured by an on-duty public employee (as opposed to by a third person or by a private or naturally occurring risk).
     To be sure, under the MTCA, the Legislature has protected public employers against being held vicariously liable for a public employee's intentional assault.  See G. L. c. 258, § 10 (c) (§ 10 [c]).  Nonetheless, we have previously determined that, consistent with § 10 (c), the public employer can be liable under the MTCA where it commits a breach of the ordinary duty to exercise reasonable care in the selection of an employee to interact with the public by choosing to place an employee in that position despite knowing of the employee's untreated, assaultive behaviors.  We now conclude that § 10 (j) also provides no safe harbor in such circumstances.  Further concluding that the MBTA has provided no reason that compels us to revisit our § 10 (c) jurisprudence, we affirm the denial of summary judgment and remand the matter for further proceedings.1
     1.  Background.  a.  Facts.  The following material facts are taken from the undisputed record; because the matter is before us on the MBTA's motion for summary judgment, where disputes exist, we recite the facts in the light most favorable to the nonmoving party, Theisz.  Gibney v. Hossack, 493 Mass. 767, 768 (2024).
     i.  Bus driver.  In December 2010, the MBTA hired Derek Smith (bus driver or driver) as a part-time bus operator.  During his three-year term on a part-time basis, the driver sometimes engaged in unsafe driving and, on occasion, interacted with the public and his supervisors in a hostile or insubordinate manner.2  
     In March 2013, the MBTA promoted the bus driver to a full-time bus operator.  Approximately seven months later, in October 2013, the bus driver was involved in a violent altercation with an MBTA customer.  On that day, the MBTA scheduled the bus driver to drive a bus route in the city of Lynn.  While on the route, the driver noticed a passenger whom he considered to be behaving in an unruly manner; in response, he left the driver's seat of the moving bus and physically assaulted the passenger.  The passenger, who witnesses reported struck or spat at the driver, eventually attempted to retreat to no avail; the driver continued to beat him.  Meanwhile, the bus, which the driver had left unattended as he attacked the passenger, struck three parked cars, endangering the lives of all the passengers onboard as well as any persons and property in the bus's uncontrolled path.  The MBTA suspended the bus driver for one day after which he resumed his regular activities as a bus operator.  No other disciplinary action was taken; and the bus driver was not required to attend any training directed at assisting him to better manage customers or his anger.
     Four months later, in February 2014, the bus driver again engaged in misconduct in the course of his employment; the incident led to his arrest.  On that day, the MBTA again scheduled the bus driver to drive a Lynn bus route.  Rather than stop the bus at the designated bus stop, which had been shoveled clear of snow, the bus driver stopped the bus in the middle of the street and blocked traffic.  A police officer, who was at the scene, asked the driver to avoid obstructing traffic in the future by stopping the bus closer to the curb.  The bus driver escalated the encounter, giving the officer a "hard time," and eventually the officer asked the driver for his license.  The driver refused to comply with the officer's request.  Ultimately, after five exchanges during which the officer continued to request the driver's license, the officer arrested the driver.  As a result, MBTA passengers were left stranded mid-commute on the sidewalk next to an unattended bus.  The MBTA took no disciplinary action against the driver; and the driver received no training.
     ii.  Theisz incident.  The incident giving rise to the present action took place approximately one year later, on March 3, 2015.  On that day, Theisz had fallen asleep on an MBTA bus.  Upon awakening, Theisz got off the bus and found himself lost in Lynn in blizzard conditions.
     When Theisz saw another MBTA bus, he attempted to wave it down at a bus stop; Theisz intended to ask the bus's operator for directions as to how he might find a bus to return to Boston.  The bus was operated by the bus driver, whom the MBTA again had scheduled to drive a bus route in Lynn.
     As the bus driver drove by the bus stop where Theisz stood waiting, Theisz rapped on the bus's back door.  The driver did not stop in response to Theisz's knocking.  When the driver eventually stopped the bus, Theisz was able to catch up; Theisz banged on the bus's front door to get the driver's attention.  The driver opened the door.  
     Lost, cold, and frustrated at the prospect of being stranded, Theisz first questioned why the bus driver had not stopped sooner.  The driver responded by yelling at Theisz and leaving his driver's seat to confront Theisz at the door.  The driver kicked snow from the bottom of the bus at Theisz.  Theisz uttered a profanity.  This further triggered the bus driver's anger; as the driver subsequently described it, he just "lost it."  Enraged, the driver lunged at Theisz, escalating the encounter.
     For his part, Theisz retreated, but the driver gave chase.  When the driver caught up, the driver commenced punching and kicking Theisz.  The beating was so severe that Theisz suffered a traumatic brain injury that has left him "permanently and totally disabled from his usual employment."3
     b.  Procedural history.  Theisz commenced the present action in the Superior Court against the MBTA,4 asserting claims under the MTCA for the MBTA's negligence in hiring, training, supervising, and retaining the bus driver.5  The MBTA moved for summary judgment on the ground that it was immune from liability under § 10 (j).6  The motion judge denied the MBTA's motion, and the MBTA appealed.7  In a comprehensive and well-reasoned opinion, the Appeals Court affirmed.  See Theisz v. Massachusetts Bay Transp. Auth., 103 Mass. App. Ct. 822 (2024).  The MBTA sought further appellate review, which we allowed.
     2.  Discussion.  a.  Standard of review.  "Our review of a decision on a motion for summary judgment is de novo."  Berry v. Commerce Ins. Co., 488 Mass. 633, 636 (2021).  "Summary judgment is appropriate where there is no material issue of fact in dispute and the moving party is entitled to judgment as a matter of law."  HSBC Bank USA, N.A. v. Morris, 490 Mass. 322, 326 (2022), citing Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991), and Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002).  We view any disputed facts in the light most favorable to the nonmoving party.  Gibney, 493 Mass. at 768.
     b.  Statutory framework.  The MTCA sets forth a statutory scheme to permit individuals harmed by the tortious conduct of public employees to seek compensation from the Commonwealth and its political subdivisions.8  See Cormier v. Lynn, 479 Mass. 35, 38-39 (2018).  It provides, in relevant part, that a public employer
"shall be liable for . . . personal injury . . . caused by the negligent or wrongful act . . . of any public employee while acting within the scope of his . . . employment, in the same manner and to the same extent as a private individual under like circumstances."
G. L. c. 258, § 2.
     While the statute allows the public employer to be held liable for the tortious conduct of its employees, it retains certain protections for public employers that generally are not available to their private counterparts.  For example, the MTCA provides for a cap on the damages that can be assessed against some public employers.9  See G. L. c. 258, § 2 (setting $100,000 liability cap).  The statute also shields government employers from vicarious liability for the intentional torts of its employees.  G. L. c. 258, § 10 (c) (providing that public employer is not liable for "any claim arising out of an intentional tort," including assault and battery).  Contrast Lev v. Beverly Enters.-Mass., Inc., 457 Mass. 234, 238 (2010) (private employer may be vicariously liable for employees' intentional torts if tortious conduct is within scope of employment).
     i.  Common-law public duty rule.  In addition to the statutory protections, we created a common-law "public duty rule," which, "broadly stated, . . . protect[ed] governmental units from liability unless an injured person seeking recovery [could] show that the duty breached was a duty owed to the individual himself, and not merely to the public at large."  Jean W. v. Commonwealth, 414 Mass. 496, 500-501 (1993) (Liacos, C.J., concurring).  Pertinent to the present appeal, the common-law public duty rule barred government tort liability where
"a plaintiff has been harmed by a condition or situation which was not originally caused by the public employee, and is attributable to the employee only in the sense that the employee failed to prevent or mitigate it" (emphases added).
Cyran v. Ware, 413 Mass. 452, 467 (1992) (O'Connor, J., concurring).  
     The common-law rule provided no immunity to a public employer where the plaintiff's theory of liability stemmed not from a breach of a government-imposed duty to protect against certain harms, but rather from the public employees' affirmative acts directly contributing to the party's harm.  See Onofrio v. Department of Mental Health, 408 Mass. 605, 610 (1990), S.C., 411 Mass. 657 (1992) (distinguishing failure to act in breach of government duty to prevent harm by third parties from affirmative act directly causing plaintiff's harm).  The common-law rule afforded no protection in the latter scenario because the public employees' duty "was no different than it would have been had the [public] employees been acting merely as private individuals.  Their duty is grounded in the general rule that one who takes action ordinarily owes to everyone else who may be affected thereby a duty to act reasonably."  Id. 
     ii.  Section 10 (j).  After we determined to abrogate the common-law public duty rule, the Legislature responded by amending the MTCA to include, inter alia, § 10 (j).10  See St. 1993, c. 495, § 57 (effective Jan. 14, 1994).  Section 10 (j) provides, in relevant part, that public employers will not be liable for
"any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer."
G. L. c. 258, § 10 (j).11  Recognizing that § 10 (j) "was intended to provide some substantial measure of immunity from tort liability to government employers," Brum v. Dartmouth, 428 Mass. 684, 695 (1999), we have construed it generally to provide immunity when the tort claim is based on a public employee's failure to prevent harm from third persons or from naturally occurring or private risks,12 unless the public employee or public employer "originally caused" the situation giving rise to the risk.  See Cormier, 479 Mass. at 40.
     Because we have observed that the language of § 10 (j) "presents an interpretive quagmire," Brum, 428 Mass. at 692, and because § 10 (j) derives from the common-law public duty rule, see note 10, supra, we have looked to the common-law rule in our construction of the provision.  Indeed, we have noted that the Legislature's use of the term "originally caused" in § 10 (j) derives from the description of the common-law public duty rule provided in Justice O'Connor's concurrence in Cyran, 413 Mass. at 462.  See discussion supra.  See also Brum, supra at 693 (acknowledging Justice O'Connor's concurrence as "likely source for the language used in the statute").  
     A.  Affirmative act.  Relying on the provision's roots, we have concluded that the language "originally caused" in § 10 (j) requires an "affirmative act" on the part of the public employer or employee, not a mere failure to act to prevent a harm by a third person or by a naturally occurring or private risk.  Brum, 428 Mass. at 695, discussing Bonnie W. v. Commonwealth, 419 Mass. 122, 125 (1994).  We reasoned that, absent some affirmative act requirement, the first clause of § 10 (j) providing immunity from claims based on "an act or failure to act to prevent or diminish the harmful consequences of a condition or situation" would be rendered meaningless.  See Brum, supra at 695-696 (adopting interpretation aligning with "principal purpose of § 10 [j] . . . to preclude liability for failures to prevent or diminish harm").  
     Our decision in Bonnie W., 419 Mass. at 126-127, is instructive.  There, we addressed whether § 10 (j) provided immunity to the Commonwealth against two claims by a trailer park resident who was raped by a parolee; the parolee had been hired to perform maintenance by the trailer park owner on the recommendation of the parole officer charged with supervising the parolee.  The first claim charged that the Commonwealth was liable because its employee, the parole officer, had failed to meet with the parolee monthly as required by parole board rules and thus had been negligent in his supervision of the parolee.  Id. at 125.  We determined that this claim was based on a theory that, by negligently supervising the parolee, the parole officer negligently failed to prevent the parolee from gaining access to the resident's mobile home.  Id. at 126.  Such a failure to act claim was not an affirmative act by the public employee, and as such, § 10 (j) provided immunity to the Commonwealth.13  Id.
     The second claim charged that the Commonwealth was liable because the parole officer had recommended the parolee for continued employment at the trailer park and had given incorrect information to the owner after the owner discovered the parolee's criminal history, which included a rape.  Bonnie W., 419 Mass. at 125.  Relying on our jurisprudence from the common-law public duty rule, we concluded that § 10 (j) provided no immunity to the Commonwealth as to this theory of liability because it was grounded in the affirmative conduct of the parole officer in recommending the parolee and misrepresenting his criminal history.  Id. at 126-127, citing Onofrio, 408 Mass. at 610.
     B.  Remoteness.  In addition to the "affirmative act" requirement, we have construed § 10 (j) to protect public employers against claims where the affirmative act is "too remote as a matter of law"; instead, the "affirmative act" must have "materially contributed to creating the specific 'condition or situation' that resulted in the harm."  Kent v. Commonwealth, 437 Mass. 312, 319 (2002).  In the absence of such a requirement, we reasoned, the broad immunity provided by § 10 (j) would be vitiated as any upstream action might be said to have caused, however indirectly, a downstream harm.  See id. at 318-319, quoting Brum, 428 Mass. at 695 (declining to adopt interpretation of § 10 [j] "that construes the words 'originally caused' so broadly as to encompass the remotest causation and preclude immunity in nearly all circumstances").  Applying this requirement in Kent, we concluded that § 10 (j) provided immunity to the parole board where its decision to release a convicted murderer from State custody to a Federal immigration enforcement agency was too remote to be the original cause of the plaintiff's injury, when the parolee returned to the Commonwealth and shot the plaintiff eight years later.  Kent, supra at 318-320 (absent "closer connection" between alleged affirmative act and plaintiff's harm, § 10 [j] provides immunity).  
     In Shapiro v. Worcester, 464 Mass. 261, 272-273 (2013), however, we concluded that a city's decision more than a decade earlier to permit the Metropolitan District Commission (MDC) to discharge effluent into the city's sewer system in exchange for MDC's agreement to make certain improvements to the city's sewer system satisfied the nexus requirement.  We reasoned that the evidence showed that the city was aware that absent the agreed-on improvements, the city's sewer system would likely back up during severe weather conditions, causing damage to properties in the areas of the overflow.  Id. at 270-271.  Nevertheless, the city failed to insist on MDC's compliance with the agreement.  Id.  When the sewer system overflowed, as had been predicted, the plaintiffs' homes were flooded and damaged.  Id. at 263-264.  We concluded that § 10 (j) did not protect the city in these circumstances.  Id. at 272-273.    
     With this framework in mind, we turn to the MBTA's arguments.
     c.  Affirmative act requirement based on supervisory negligence of public employee.  The MBTA contends that it is immune under § 10 (j) because Theisz's claim is not based on an affirmative act; instead, the MBTA argues, his central claim is grounded on the MBTA's failure to prevent harm by the bus driver.  The MBTA's argument rests on a misapprehension of our case law.
     To be sure, as discussed supra, where an individual is harmed directly by a nongovernmental third person, § 10 (j) can provide immunity to a public employer against claims based on its negligent supervision of the nongovernmental actor or of a public employee who, in turn, fails to prevent harm from the nongovernmental actor.  See, e.g., Cormier, 479 Mass. at 41-42 (school district not liable for staff's failure to supervise students or for school district's failure to supervise staff regarding implementation of antibullying policies, because both theories constituted failure to prevent harm from nongovernmental actor); Bonnie W., 419 Mass. at 125 (claim that parole officer negligently supervised parolee was barred by § 10 [j], but claim that officer negligently recommended assailant for employment was not).  
     Here, Theisz was not harmed by a nongovernmental actor.  Instead, Theisz's harm was at the hands of the driver -- an on-duty public employee -- and his claim is based on the public employer's negligence in hiring, promoting, supervising, and retaining its own employee.  Nothing in our case law supports the MBTA's argument that § 10 (j) provides refuge in such a situation.  Indeed, the language of § 10 (j) is to the contrary.14  Section 10 (j) provides immunity where the claim regards a "condition or situation" not "originally caused" by the public employer -- that is, where a nongovernmental actor or a naturally occurring or private risk (as opposed to a public employee) directly causes the harm.  G. L. c. 258, § 10 (j).
     Of course, the MBTA is not vicariously liable for the bus driver's intentional assault against Theisz.  See G. L. c. 258, § 10 (c).  See also note 5, supra.  But the claims at issue here are based on the MBTA's own failure to exercise reasonable care in its supervision of the bus driver; as we have explained, "where the supervisory officials allegedly had, or should have had, knowledge of a public employee's assaultive behavior, it is the supervisors' conduct, rather than the employee's intentional conduct, that is the true focus of the case."  Dobos v. Driscoll, 404 Mass. 634, 653, cert. denied, 493 U.S. 850 (1989) (affirming judgment against Commonwealth for negligent supervision and training of officer who assaulted civilian).  See Doe v. Blandford, 402 Mass. 831, 836-838 (1988) (MTCA permitted claims regarding public employer's negligent conduct in hiring, retaining, and supervising guidance counselor who assaulted student independent of alleged vicarious liability for intentional tort of public employee).  
     Notably, private employers hiring public-facing employees must exercise reasonable care in selecting those employees and, in retaining them, must continue "exercising reasonable care to ensure that their employees do not cause foreseeable harm to a foreseeable class of plaintiffs."  See Helfman v. Northeastern Univ., 485 Mass. 308, 326 (2020), quoting Roe No. 1 v. Children's Hosp. Med. Ctr., 469 Mass. 710, 714-715 (2014).  See, e.g., Foster v. Loft, Inc., 26 Mass. App. Ct. 289, 290-291 (1988) (private employer liable for negligent hiring and retention of bartender with known criminal record who assaulted patron).  A private employer who fails to exercise reasonable care in hiring, training, supervising, and retaining such public-facing employees can be liable for its negligence in this regard.  Helfman, supra.  Foster, supra.  Contrary to the MBTA's assertion, § 10 (j) provides no basis to treat public employers different from private employers in this regard.  
     In sum, § 10 (j) does not provide immunity to a public employer for its misfeasance in placing an employee with known but untreated anger management issues that manifest in violent and hostile behaviors in a public-facing position.  The record on summary judgment here would support a fact finder's reasonable conclusion that the MBTA's affirmative act -- its own decision, through its public employees responsible for supervising the bus driver, to schedule the driver to operate the bus route in Lynn, without training him to manage his anger -- originally caused Theisz's harm.   
     d.  Timing of decision to place driver in public-facing position.  The MBTA next maintains that "even if promotion" is an affirmative act that caused the condition (the bus driver being in a public-facing position) that led to the harmful consequence of Theisz being assaulted and severely injured, the bus driver's promotion to full-time employee in March 2013 is too remote to be the proximate cause of Theisz's injuries two years later in March 2015.  This myopic focus on the bus driver's promotion fails to capture the basis of Theisz's claim.  His claim is not grounded solely on a remote decision made by the MBTA years earlier; instead, the claim rests on the more recent decision of the MBTA to schedule the bus driver, with a known and untreated history of assaultive and insubordinate behavior, to drive the route in Lynn that placed the driver face to face with Theisz on that snowy evening and resulted in the bus driver beating Theisz.  
     Our decision in Kent is not to the contrary.  There, the parole board's decision to release the parolee in 1987 was not followed by any other affirmative governmental action before the parolee shot and injured the plaintiff eight years later.  See Kent, 437 Mass. at 319-320.  In contrast, the MBTA here made an affirmative decision, not only when it promoted Theisz to a full-time bus operator, but also when it affirmatively decided to put the bus driver, a "ticking time bomb" with a demonstrated volatile and violent temper, on the streets as an operator to drive the Lynn bus route on the evening that the bus driver assaulted Theisz.15  That latter decision, a fact finder could reasonably conclude, was an affirmative act that "materially contributed to creating the specific 'condition or situation' that resulted in the harm" to Theisz.  Id. at 319.
     e.  Section 10 (c).  Finally, the MBTA asks us to reconsider whether Theisz's claim is barred by § 10 (c), which provides public employers immunity against 
"any claim arising out of an intentional tort, including assault, battery, false imprisonment, false arrest, intentional mental distress, malicious prosecution, malicious abuse of process, libel, slander, misrepresentation, deceit, invasion of privacy, interference with advantageous relations or interference with contractual relations."
G. L. c. 258, § 10 (c).  The provision precludes a public employer from being held vicariously liable for the intentional tort of a public employee.  See FBT Everett Realty, LLC v. Massachusetts Gaming Comm'n, 489 Mass. 702, 718 (2022), quoting Spring v. Geriatric Auth. of Holyoke, 394 Mass. 274, 285 (1985) ("even after the passage of the MTCA, 'public employers remain immune from intentional tort claims'").  The MBTA asks us to construe § 10 (c) to protect the public employer for its negligent supervision of a public employee who commits an intentional tort.  Specifically, the MBTA urges adoption of the United State Supreme Court's construction of identical language in the Federal Tort Claims Act (FTCA).  In United States v. Shearer, 473 U.S. 52, 54-55 (1985), the Court addressed whether the FTCA's exception to the waiver of sovereign immunity for "[a]ny claim arising out of assault [or] battery" included a claim of "negligent failure to prevent the assault and battery."  The Court concluded that the FTCA's provision was broad and covered claims "that sound in negligence but stem from a battery committed by a Government employee."  Id.
     Three years later, we addressed the scope of § 10 (c).  We specifically considered the Court's decision in Shearer, but determined that a narrow interpretation of the "arising out of" language was more appropriate:  
"The Legislature, by excluding intentional torts from the waiver of governmental immunity, sought to insulate the government from liability for intentional conduct which it had not authorized.  In this case, where the defendants allegedly had, or should have had, knowledge of [an employee's] assaultive behavior, the negligence of the defendants is the true focus of the case.  The claim is not barred by G. L. c. 258, § 10 (c)." 
Doe, 402 Mass. at 837-838 & n.4.  In the wake of our decision, the Legislature has not amended § 10 (c).  Stare decisis "carries enhanced force" in connection with our construction of a statute, where our decision "effectively become[s] part of the statutory scheme."  Kimble v. Marvel Entertainment, LLC, 576 U.S. 446, 456 (2015).  This is because the Legislature is free to amend a statute where it concludes that our construction of its intent is wrong.  Rather than taking it upon ourselves to revisit our prior jurisprudence on the basis that we now think the prior court's reasoning is no longer persuasive, we should recognize that when it comes to matters of statutory construction "critics of our ruling can take their objections across the street, and [the Legislature] can correct any mistake it sees."  Id.  Indeed, here we are faced squarely with a situation in which the Legislature could have altered our prior holding and has not done so.  Five years after our decision in Doe, the Legislature amended § 10 in response to our abrogation of the common-law public duty rule and left § 10 (c) untouched.  See G. L. c. 258, § 10, as amended by St. 1993, c. 495, § 57.  See also Chapman, petitioner, 482 Mass. 293, 306 (2019), quoting Commonwealth v. Rivera, 445 Mass. 119, 128 (2005) ("The principle of stare decisis is 'particularly weighty' where, as here, 'the Legislature has declined to exercise its authority to overturn the court's interpretation of a statute'").  The MBTA has identified no compelling reason to depart from our prior case law.  See Johnson v. Settino, 495 Mass. 42, 50-52 (2024) (discussing principle of stare decisis and cautioning that departing from prior decision "must be undertaken with great care"). 
     3.  Conclusion.  Based on the foregoing, we affirm the denial of the MTBA's motion for summary judgment.
So ordered.
footnotes

     [1] We acknowledge the amicus brief submitted by the Massachusetts Academy of Trial Attorneys and the American Association for Justice and the amicus letter submitted by the Massachusetts Municipal Lawyers Association.  
     [2] For example, in October 2011, the bus driver, while operating a bus, yelled at a motorist and then refused to give the motorist his badge number in violation of MBTA policies.  The record is devoid of information concerning the discipline or training, if any, the driver received following this incident.
     The driver's other infractions included a September 2011 report that the driver, despite direct instructions, refused to abide by scheduled departure times, a December 2011 report that the driver, knowing that a supervisor was monitoring his conduct, failed to stop at a stop sign, and a February 2012 report that the driver refused to stop his bus to allow passengers, waiting at a designated bus stop, to board the bus.  The record indicates that the driver was "reinstructed" following the February 2012 incident but is otherwise silent as to any training or discipline the driver received during his tenure as a part-time employee.
     [3] The Commonwealth brought criminal charges against the bus driver for assault and battery and assault and battery by means of a deadly weapon; he was acquitted following a jury trial.  See Commonwealth vs. Smith, Mass. Super. Ct., No. 1677CR00159 (Essex County July 26, 2017).
     [4] Theisz also brought claims against the bus driver.  The driver did not respond to the complaint, and he eventually was defaulted.  The MBTA is the only remaining defendant.
     [5] Theisz's claim against the MBTA for the bus driver's intentional assaultive conduct properly was dismissed pursuant to G. L. c. 258, § 10 (c).  
     [6] The MBTA also argued that it was immune from liability under G. L. c. 258, § 10 (b), an argument it does not press on appeal.
     [7] The MBTA's appeal was proper under the doctrine of present execution, which is a narrow exception to the finality rule, permitting "immediate appeal from an interlocutory order if the order will interfere with rights in a way that cannot be remedied on appeal from a final judgment."  Kent v. Commonwealth, 437 Mass. 312, 315 n.6 (2002).  Theisz filed an improper cross appeal.  See J.F. Stanton, Appellate Practice and Procedure § 11:13 (4th ed. 2020).  
     [8] We recently have had occasion to review both the history of the common-law doctrine of sovereign immunity and, following our announced decision to abrogate the doctrine, the Legislature's enactment of the MTCA.  See Magliacane v. Gardner, 483 Mass. 842, 848-849 (2020); Cormier v. Lynn, 479 Mass. 35, 37-39 (2018).
     [9] This liability cap does not apply to the MBTA.  G. L. c. 258, § 2 (excepting claims of serious bodily injury against MBTA from damages limitation).
     [10] In Brum v. Dartmouth, 428 Mass. 684, 693-695 (1999), we detailed the history of the common-law public duty rule, our announcement that we would abrogate the rule, and the Legislature's response by amending § 10 to include subsections (e) through (j).  Subsections (e) through (i) provide specific immunity for licensing, G. L. c. 258, § 10 (e), property inspections, G. L. c. 258, § 10 (f), fire protection services, G. L. c. 258, § 10 (g), police protection services, G. L. c. 258, § 10 (h), and the release, parole, or escape of any person from a public employer's or employee's custody, G. L. c. 258, § 10 (i).  Section 10 (j) is not tethered to a particular government function.
     [11] Section 10 (j) also sets forth that the section's immunity shall not apply to
"(1) any claim based upon explicit and specific assurances of safety or assistance, beyond general representations that investigation or assistance will be or has been undertaken, made to the direct victim or a member of his family or household by a public employee, provided that the injury resulted in part from reliance on those assurances.  A permit, certificate or report of findings of an investigation or inspection shall not constitute such assurances of safety or assistance; and 
"(2) any claim based upon the intervention of a public employee which causes injury to the victim or places the victim in a worse position than he was in before the intervention; and 
"(3) any claim based on negligent maintenance of public property; [and] 
"(4) any claim by or on behalf of a patient for negligent medical or other therapeutic treatment received by the patient from a public employee.
"Nothing in this section shall be construed to modify or repeal the applicability of any existing statute that limits, controls or affects the liability of public employers or entities."
G. L. 258, § 10 (j).  Neither party asserts that these exceptions are relevant to the issues on appeal.
     [12] The MBTA correctly notes that the immunity under § 10 (j) is not limited to the harmful consequences caused by third persons. The language in § 10 (j) referring to "the violent or tortious conduct of a third person" is illustrative and not limiting.  See Maryland Cas. Co. v. NSTAR Elec. Co., 471 Mass. 416, 420 (2015), quoting Puerto Rico Maritime Shipping Auth. v. Interstate Commerce Comm'n, 645 F.2d 1102, 1112 n.26 (D.C. Cir. 1981) (acknowledging it is "hornbook law that the use of the word 'including' indicates . . . that [what] follows is illustrative, not exclusive"); Jacome v. Commonwealth, 56 Mass. App. Ct. 486, 488-489 (2002) (determining that § 10 [j] "is not restricted to those claims arising from the violent or tortious behavior of third persons" because "the word 'including' . . . plainly introduces a phrase intended to provide only one example of an immunized claim").
     [13] Similarly, in Cormier, we addressed whether § 10 (j) provided immunity to a public school where a student, whose mother had reported was being bullied by several other students, was pushed down a stairwell by one of the bullies as the children lined up at the start of the school day as required by the school's policy.  Cormier, 479 Mass. at 36-38.  We examined claims that the school failed to protect the student, despite the mother's reports, that the school failed to enforce its antibullying policy, and that the school failed to supervise students lined up consistent with the school's policy.  Id. at 41-42.  We concluded that such claims were barred by § 10 (j) "because they originate[d] from a failure to act rather than an affirmative act."  Id. at 41.  None of the claims met the affirmative act requirement for liability; at bottom, each sought "to hold the school liable for not acting in a manner that ensured [the student's] safety."  Id. at 42.  See Brum, 428 Mass. at 686-687, 696 (§ 10 [j] provided immunity to school that failed to prevent harm to student who was stabbed by armed intruders despite notice to school officials of prior violent altercation at school and intruders' threats to retaliate).
     [14] See Commonwealth v. Newberry, 483 Mass. 186, 192 (2019) (language of statute is "principal source of insight" into legislative intent [citation omitted]).
     [15] Nor can the MBTA find solace in our decision in Cormier.  Unlike here, the plaintiff in Cormier, a student, was injured by a classmate, a third-person nongovernmental actor.  Cormier, 479 Mass. at 41.  Certain acts by the public defendants indirectly contributed to the student's injuries, such as the Commonwealth's general school attendance requirement and the school's decision to place the student in the same class as his tormentors.  We determined that those actions were too remote to be the original cause of the student's injury.  Id.  The MBTA's decision to schedule the volatile bus driver was not similarly attenuated from the harm to Theisz.