GANTS, C.J.
**293 The issue presented in this appeal is whether, under the statutory scheme set forth in G. L. c. 123A, an individual who **294 seeks to be discharged from civil commitment as a sexually dangerous person must remain civilly committed awaiting trial, sometimes for years, after both qualified examiners have concluded that he or she is no longer sexually dangerous. In Johnstone, petitioner, 453 Mass. 544, 553, 903 N.E.2d 1074 (2009), we held that G. L. c. 123A implicitly provides that an individual may not be civilly committed as a sexually dangerous person, or have his or her civil commitment continued after petitioning for release from custody, unless at least one of two qualified examiners offers the opinion that the individual is sexually dangerous. We held that, where neither of the two qualified examiners concludes that the individual is a sexually dangerous person, the Commonwealth "cannot rely upon other sources of potential expert evidence ... to meet its burden of proof," and the petitioner is entitled to release before trial. Id. at 545, 553, 903 N.E.2d 1074. In this case, the Commonwealth asks us to revisit our holding in Johnstone and to hold that the Commonwealth may proceed to trial where it has expert opinion, other than the expert opinion of a designated qualified examiner, that the individual is or remains sexually dangerous.
The Commonwealth has failed to persuade us that Johnstone was incorrectly decided; nor has the Commonwealth provided any evidence that the holding in Johnstone has compromised public safety. We therefore decline to reject a statutory interpretation that has been applied in sexual dangerousness cases for approximately ten years. Furthermore, we conclude that our interpretation of G. L. c. 123A in Johnstone obviates any need to address the due process concerns that might arise if a civil commitment could be prolonged despite the conclusion of both qualified examiners that an individual is not sexually dangerous, and honors the presumption that the Legislature intends its statutes to pass constitutional muster. For these reasons, we affirm the Superior Court judge's order allowing Wayne Chapman's petition for release from civil commitment because neither of two qualified examiners found him presently to be sexually dangerous.[1]
*509 Background. In September 1977, Chapman was convicted of two counts of rape of a child and sentenced to a prison term of not **295 less than fifteen and not more than thirty years. See Commonwealth v. Chapman, 444 Mass. 15, 16, 825 N.E.2d 508 (2005). In November 1977, Chapman was found to be a sexually dangerous person under the predecessor statute to the current G. L. c. 123A. Id. As a result, in March 1978, he was transferred from prison to the Massachusetts Treatment Center (treatment center), where he was committed for an indefinite term of from one day to life.[2] ,[3] Id. at 16 & n.1, 825 N.E.2d 508. **296 In 1991, Chapman petitioned for release from civil commitment. Under G. L. c. 123A as it existed at the time of Chapman's petition, "if, at any annual [discharge] hearing to which [a sexually dangerous person was] entitled, the Commonwealth fail[ed] in its burden of proving continued sexual dangerousness, and *510 part of the original sentence then remain[ed], the person [was] returned to ordinary confinement to serve the remainder of his [or her] term." Commonwealth v. Rodriguez, 376 Mass. 632, 640, 382 N.E.2d 725 (1978). See Chapman, 444 Mass. at 18 n.5, 825 N.E.2d 508. Following a hearing, the judge concluded that the Commonwealth had failed to prove beyond a reasonable doubt that Chapman continued to be sexually dangerous and ordered him to be discharged from the treatment center and transferred back to prison to serve the remaining years on his sentence. Chapman, supra at 18, 825 N.E.2d 508.
In September 2004, when Chapman had approximately one month remaining until his anticipated release from prison, the Commonwealth filed a petition to commit Chapman as a sexually dangerous person beyond the term of his criminal sentence, this time under the current version of G. L. c. 123A. Chapman, 444 Mass. at 18, 825 N.E.2d 508. Chapman moved to dismiss the commitment petition on collateral estoppel grounds, arguing that the 1991 adjudication that he was not sexually dangerous precluded the Commonwealth from again petitioning for his civil commitment. Id. at 20, 825 N.E.2d 508. A Superior Court judge allowed this motion. Id. The Commonwealth appealed, and we vacated the order of dismissal, concluding that the Commonwealth's 2004 petition did not improperly "seek to relitigate an issue previously adjudicated" because it asserted that Chapman was presently sexually dangerous, and not that he had been sexually dangerous in 1991. Id. at 20-24, 825 N.E.2d 508. In 2007, after trial, Chapman was found to be sexually dangerous and committed to the treatment center for an indeterminate period of from one day to life. The Appeals Court affirmed this judgment in an unpublished memorandum and order pursuant to its rule 1:28. See Commonwealth v. Chapman, 75 Mass. App. Ct. 1113, 916 N.E.2d 774 (2009), cert. denied, 560 U.S. 946, 130 S.Ct. 3370, 176 L.Ed.2d 1257 (2010).
Chapman has since filed four petitions for discharge from civil commitment under G. L. c. 123A, § 9 -- one in 2007, one in 2009, one in 2012, and one in 2016. The 2012 and 2016 petitions, **297 which have been consolidated, are at issue here.[4] Pursuant to G. L. c. 123A, § 9, the petitioner was evaluated by two qualified examiners; both concluded in written reports submitted to the court that Chapman was no longer sexually dangerous. Dr. Gregg A. Belle, one of the qualified examiners, stated that Chapman was no longer a sexually dangerous person based on "the combination of *511 [his] age and his deteriorating physical condition resulting in him no longer being able to manage independently." Dr. Katrin Rouse Weir, the other qualified examiner, stated that Chapman "would not be reasonably expected to sexually assault children if released into the community at this time," because "his age, his present medical status and the degree of supervision required and available at an appropriate placement in the community would sufficiently mitigate his risk of sexual re-offense."
Chapman was also evaluated by a five-member community access board (CAB).[5] Three CAB psychologists concluded that Chapman remained sexually dangerous; two CAB psychologists concluded that he was no longer sexually dangerous.
Because both qualified examiners had offered the opinion that Chapman was no longer sexually dangerous, and because the Commonwealth cannot prevail at trial without an opinion from **298 one of the qualified examiners that Chapman is sexually dangerous, Chapman moved for discharge. See Johnstone, 453 Mass. at 545, 903 N.E.2d 1074. The Commonwealth opposed the motion and moved for trial or, alternatively, to stay Chapman's release. The Superior Court judge, relying on Johnstone, allowed the petitioner's motion and denied the Commonwealth's motion, but stayed Chapman's discharge for twenty days to allow the Commonwealth to seek a further stay from an appellate court.
The Commonwealth filed a notice of appeal and a motion to stay the petitioner's discharge until the resolution of that appeal. A single justice of the Appeals Court continued the stay pending further order of the court. We granted direct appellate review, and a single justice of the county court continued the stay of Chapman's discharge pending resolution of this case.
Discussion. 1. Due process constraints on deprivations of liberty. Liberty -- "[t]he right of an individual to be free from physical restraint" -- is a fundamental right. Matter of E.C., 479 Mass. 113, 119, 92 N.E.3d 724 (2018), quoting Commonwealth v. Knapp, 441 Mass. 157, 164, 804 N.E.2d 885 (2004). "Laws in derogation of liberty," therefore, "must be narrowly tailored to further a compelling and legitimate government interest, and must be strictly construed, in order to comply with the requirements of substantive due process" (citation and alteration omitted). Matter of E.C., supra.
In the civil context, deprivation of liberty is justified not by the crimes that an individual committed in the past, but by the risk that the individual will inflict serious physical harm on him- or herself or others in the future. See, e.g., G. L. c. 123, § 8 (a ) (civil commitment of mentally ill person impermissible unless release "would create a likelihood of serious harm"); G. L. c. 123A, § 1 (to qualify as sexually dangerous person subject to civil commitment, individual must be likely to sexually reoffend). Because a civil commitment is justified only to prevent future harm, a person constitutionally may be deprived of his or her fundamental right to liberty only in " 'certain narrow circumstances' where the individual's dangerousness is linked to a mental illness or abnormality that causes the individual to *512 have 'serious difficulty' in controlling his or her behavior." Kenniston v. Department of Youth Servs., 453 Mass. 179, 184, 900 N.E.2d 852 (2009), quoting Kansas v. Crane, 534 U.S. 407, 409, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002). See Crane, supra at 412-413, 122 S.Ct. 867, quoting Kansas v. Hendricks, 521 U.S. 346, 373, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (Kennedy, J., concurring) ("proof of serious difficulty in controlling behavior" required for civil commitment, "lest [it] become a 'mechanism for retribution or general deterrence' -- functions properly those **299 of criminal law, not civil commitment").
2. Civil commitments in Massachusetts. The civil commitment procedures established by statute in Massachusetts differ greatly depending on whether an individual is alleged to be dangerous by reason of mental illness under G. L. c. 123 or sexually dangerous by reason of mental abnormality or personality disorder under G. L. c. 123A. When the danger to be prevented is physical harm arising from mental illness and the Commonwealth seeks civil commitment under G. L. c. 123, §§ 7 - 8, an individual will not generally be held involuntarily for longer than one month before there is an adjudication based on proof beyond a reasonable doubt. This is because an emergency commitment under c. 123 may last no longer than three days, a petition for commitment must generally be heard within five days, and a judge must generally issue his or her decision on that petition for commitment within ten days.[6] See G. L. c. 123, §§ 7, 12. A judge may not civilly commit an individual to a facility unless, after a hearing, he or she finds beyond a reasonable doubt that (1) the person is mentally ill; (2) discharge from a facility would create a likelihood of serious harm; and (3) "no less restrictive alternative to hospitalization is appropriate." See G. L. c. 123, § 8 (a ) ; Abbott A. v. Commonwealth, 458 Mass. 24, 40-41, 933 N.E.2d 936 (2010) ; Newton-Wellesley Hosp. v. Magrini, 451 Mass. 777, 780 n.8, 889 N.E.2d 929 (2008).
In contrast, a person alleged to be sexually dangerous may be involuntarily held in custody far longer before an adjudication by a judge or jury based on proof beyond a reasonable doubt. Where the Commonwealth contends that a prisoner who was previously convicted of a qualifying sexual offense is a sexually dangerous **300 person as defined in G. L. c. 123A, § 1, it may file a petition seeking to civilly commit the individual following his or her release from custody.[7] *513 G. L. c. 123A, § 12 (a ) - (b ). Once the Commonwealth files its petition, a judge must hold a hearing to determine whether there is probable cause to believe that the individual is sexually dangerous. G. L. c. 123A, § 12 (c ). If the individual is scheduled to be released from criminal confinement before the court's probable cause determination takes place, "the court, upon a sufficient showing based on the evidence before the court at that time, may temporarily commit such person to the treatment center pending disposition of the petition." G. L. c. 123A, § 12 (e ). "[A]bsent unusual circumstances, a probable cause hearing should commence no later than ten business days after a temporary commitment order is made under § 12 (e )." Commonwealth v. Bruno, 432 Mass. 489, 513, 735 N.E.2d 1222 (2000).
If, following a hearing, a judge finds probable cause to believe the individual is sexually dangerous, that individual "shall be committed to the treatment center for a period not exceeding [sixty] days for the purpose of examination and diagnosis under the supervision of two qualified examiners." G. L. c. 123A, § 13 (a ). Within forty-five days of the individual's commitment to the treatment center, each qualified examiner must provide the court with a written report summarizing his or her examination and diagnosis and stating whether, in the qualified examiner's professional opinion, the individual is sexually dangerous. Id. The Commonwealth has fourteen days from the time that these reports are filed to decide whether to petition the court for a trial. G. L. c. 123A, § 14 (a ). At such a trial, an individual may be committed to the treatment center only if the jury find "unanimously and beyond a reasonable doubt that the person named in the petition **301 is a sexually dangerous person." G. L. c. 123A, § 14 (d ).
The trial must be held within sixty days of the Commonwealth's filing of the petition for trial, but this statutory deadline may be continued "upon motion of either party for good cause shown or by the court on its own motion if the interests of justice so require, unless the person named in the petition will be substantially prejudiced thereby." G. L. c. 123A, § 14 (a ). The Commonwealth conceded at oral argument that a trial within sixty days "almost never happens," and that a year or more may elapse before a trial is scheduled. During this time, the individual will continue to be held at the treatment center. See G. L. c. 123A, § 14 (a ), (e ) ; Knapp, 441 Mass. at 163, 804 N.E.2d 885 ("Once a judge has found that probable cause exists to believe that a person is sexually dangerous and the Commonwealth has petitioned for trial ..., the clear intent and requirement of the statute is that the person be confined in a secure facility"). Consequently, where an individual is alleged to be physically but not necessarily sexually dangerous, deprivation of liberty pending an adjudication of dangerousness beyond a reasonable doubt is measured in weeks; where the individual is alleged to be sexually dangerous, it is often measured in years.
*514 Moreover, an individual found to pose a likelihood of serious harm by reason of mental illness under G. L. c. 123, §§ 7 - 8, is entitled to a redetermination of his or her dangerousness sooner and more frequently than an individual found to be sexually dangerous under G. L. c. 123A. Generally, a court's first c. 123 commitment order shall be valid for a period of six months, and all subsequent commitment orders shall be valid for a period of one year. G. L. c. 123, § 8 (d ). Once a commitment order expires, an individual must generally be released unless a petition for further commitment is allowed or remains pending. See G. L. c. 123, § 6 (a ). Petitions for subsequent recommitment are dismissed if they are not heard within fourteen days, unless a delay was requested by the individual or his or her attorney. See G. L. c. 123, § 7 (c ) ; Hashimi v. Kalil, 388 Mass. 607, 609-610, 446 N.E.2d 1387 (1983). Therefore, although an individual committed pursuant to G. L. c. 123, §§ 7 - 8, may be confined for many years, continued confinement requires annual findings beyond a reasonable doubt that the individual remains a danger to him- or herself or others. See G. L. c. 123, §§ 6 (a ), 8 (d ). Furthermore, an individual committed pursuant to G. L. c. 123, §§ 7 - 8, may petition for release at any time prior to the expiration of a commitment order by applying in writing to a Superior Court **302 judge.[8] G. L. c. 123, § 9 (b ).
In contrast, an individual who is civilly committed as a sexually dangerous person is committed for an indeterminate period of from one day to life. G. L. c. 123A, § 14 (d ). And once civilly committed, such individual may file a petition for reexamination and discharge no more frequently than once every twelve months.[9] G. L. c. 123A, § 9. After a petition for discharge is filed, the judge again "shall order the petitioner to be examined by two qualified examiners, who shall conduct examinations, including personal interviews, of the person on whose behalf such petition is filed and file with the court written reports of their examinations and diagnoses, and their recommendations for the disposition of such person." Id. Although G. L. c. 123A, § 9, calls for a "speedy hearing" on discharge petitions, it does not set a deadline to hold such a hearing. As a result, in practice it often takes years for a § 9 petition for discharge to be scheduled for trial, during which time the petitioner must remain civilly committed. See G. L. c. 123A, §§ 9, 14 (d ).
An individual who is alleged to be sexually dangerous under G. L. c. 123A, then, is subject to longer potential confinement periods awaiting an adjudication based on proof beyond a reasonable doubt and, after such an adjudication, less frequent opportunities for review than an individual who is alleged to be physically but not necessarily *515 sexually dangerous under G. L. c. 123, §§ 7 - 8. We are mindful of this contrast -- and the lengthy deprivation of liberty that can occur before trial where an individual is alleged to be sexually dangerous -- as we evaluate our holding in Johnstone and the Commonwealth's claim that a petitioner may be held in custody pending trial even where both **303 qualified examiners opine that the petitioner is not or is no longer sexually dangerous.
3. Qualified examiners' gatekeeper role. In Johnstone, 453 Mass. at 545, 553, 903 N.E.2d 1074, we held that if neither of the two designated qualified examiners offers the opinion that the petitioner is or remains a sexually dangerous person, "the Commonwealth cannot rely upon other sources of potential expert evidence, such as the CAB's opinion that the petitioner is sexually dangerous, to meet its burden of proof at trial," and the petitioner must therefore be discharged before trial. We recognized that c. 123A does not explicitly create this gatekeeper role for the qualified examiners, but concluded that "the statutory scheme implicitly creates such a role" by making qualified examiners "integral" to the civil commitment and discharge process. Id. at 550-551, 553, 903 N.E.2d 1074.
Qualified examiners are experts who are required by statute to be licensed psychologists or psychiatrists and to have at least two years of experience with the diagnosis or treatment of sexually aggressive offenders. G. L. c. 123A, § 1. Johnstone, 453 Mass. at 551, 903 N.E.2d 1074. Although appointed by the Commissioner of Correction, see G. L. c. 123A, § 1, an expert who serves as a qualified examiner is recognized to be independent and to serve as though appointed by the court. See Johnstone, supra. The qualified examiners, in other words, are not retained by, paid by, or beholden to any party.
We noted in Johnstone, 453 Mass. at 552, 903 N.E.2d 1074, that the statutory scheme in G. L. c. 123A "expressly sets the qualified examiners apart from other sources of expert evidence." They are "the starting point" for both the initial commitment process and the process whereby a petitioner seeks to be discharged from civil commitment, and are the only experts who are required to file their reports and recommendations with the court. Id. at 551, 903 N.E.2d 1074. If the petitioner in a discharge proceeding refuses to be personally interviewed by the qualified examiners and lacks good cause for doing so, "such person shall be deemed to have waived his [or her] right to a hearing on the petition and the petition shall be dismissed upon motion filed by the [C]ommonwealth." Id. at 551-552, 903 N.E.2d 1074, quoting G. L. c. 123A, § 9. "When interviewed by the qualified examiners, the petitioner may interpose either the psychotherapist-patient privilege of G. L. c. 233, § 20B, or the privilege against self-incrimination, but doing so precludes the petitioner from offering the opinion of his [or her] own expert at trial." Johnstone, supra at 552, 903 N.E.2d 1074. See **304 Commonwealth v. Connors, 447 Mass. 313, 318-320, 850 N.E.2d 1038 (2006). Moreover, the Commonwealth may not petition the court for trial in an initial commitment proceeding until after the qualified examiners have filed their reports. G. L. c. 123A, § 14 (a ). Having assessed the various ways that qualified examiners play a critical role in c. 123A's statutory scheme, we concluded in Johnstone, supra, that "the Legislature intended them to serve in a capacity similar to that of a gatekeeper," such that "if both qualified examiners determine that a person is not sexually dangerous, the Commonwealth cannot meet its burden of proof." *516 This "gatekeeper" role of the qualified examiners sets reasonable limitations on the prolonged deprivation of liberty that can occur, as described supra, where an individual is accused of being sexually dangerous. Because of their implicit statutory role as gatekeepers, where both qualified examiners independently conclude that the individual is not sexually dangerous, the Commonwealth is unable to prolong an individual's confinement beyond the sixty-day examination and diagnosis period. Johnstone, supra at 545, 903 N.E.2d 1074. See Commonwealth v. Gagnon, 439 Mass. 826, 831, 792 N.E.2d 119 (2003) (for "defendant's liberty interest, the relevant period is the sixty-day time period"). If the qualified examiners did not perform this role, the Commonwealth could extend the confinement of any person it claimed to be sexually dangerous until the conclusion of trial, based only on a finding of probable cause that can rest on the opinion of any expert it retained to testify that the individual is sexually dangerous.[10] See G. L. c. 123A, §§ 13 (a ), 14 (a ). Cf. Commonwealth v. Poissant, 443 Mass. 558, 565, 823 N.E.2d 350 (2005) (" Section 13 [a ] mandates that the defendant be examined by two qualified examiners. The Commonwealth cannot seek successive examinations by different experts **305 until it obtains the opinion it desires").
Similarly, where a person previously found to be sexually dangerous seeks to be discharged from civil commitment, the gatekeeping role of the qualified examiners prevents that person's commitment from being extended for longer than necessary for the qualified examiners to prepare their reports where both qualified examiners conclude that the person is no longer sexually dangerous. If the qualified examiners did not perform this gatekeeping role, the person would remain civilly committed, sometimes for years, as he or she awaited trial on the discharge petition. See G. L. c. 123A, §§ 9, 14 (d ).
In Johnstone, 453 Mass. at 552, 903 N.E.2d 1074, we rejected the argument that the Legislature intended the CAB to play any role in this gatekeeping function, holding that "the CAB's opinion cannot serve as a substitute for those of the qualified examiners." We reached this conclusion even though we recognized that two of the CAB members in Johnstone had been designated as qualified examiners but were not serving in that capacity in that case. Id. at 546 & n.2, 903 N.E.2d 1074. This conclusion is in keeping with the statutory scheme of G. L. c. 123A, which creates no special role for the CAB in the context of civil commitment and discharge proceedings. Whereas qualified examiners are called upon by statute to evaluate individuals as part of the commitment and discharge process, see G. L. c. 123A, §§ 9, 13 (a ), the CAB is statutorily required to evaluate committed individuals on an annual basis, regardless of whether they petition for discharge, see G. L. c. 123A, § 6A.
*517 The CAB's reports are then admissible, like various other sources of evidence, if and when the case goes to trial. See G. L. c. 123A, §§ 6A, 9. The statutory scheme, thus, "expressly sets the qualified examiners apart from other sources of expert evidence." Johnstone, supra at 552, 903 N.E.2d 1074.
We have previously stated that prolonging a civil commitment where neither qualified examiner offers the expert opinion that the individual is or remains sexually dangerous implicates the constitutional right to due process. See Green, petitioner, 475 Mass. 624, 629-630, 59 N.E.3d 1127 (2016) ("due process and G. L. c. 123A require proof of sexual dangerousness beyond a reasonable doubt based on expert testimony from a designated qualified examiner"). Our conclusion in Johnstone that the qualified examiners' gatekeeper role is implied in the text of G. L. c. 123A obviates any need to address the due process issue. We note, however, that in interpreting statutes that implicate constitutional concerns, we **306 assume that the Legislature intends its statutes to pass constitutional muster, and therefore "we construe statutes to avoid constitutional problems where possible." Commonwealth v. Maloney, 447 Mass. 577, 589, 855 N.E.2d 765 (2006). See Commonwealth v. Jones, 471 Mass. 138, 143, 28 N.E.3d 391 (2015) ("a statute is to be construed where fairly possible so as to avoid constitutional questions" [citation omitted] ); Commonwealth v. Kenney, 449 Mass. 840, 851, 874 N.E.2d 1089 (2007), citing Commonwealth v. Lammi, 386 Mass. 299, 301, 435 N.E.2d 360 (1982) ("court must presume every enactment of Legislature intended to comply with constitutional constraints"). See generally 2A N.J. Singer, Statutes and Statutory Construction § 45:11 (7th ed. 2014), citing Communications Workers of Am. v. Beck, 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988) ("The fact that one among alternative constructions involves serious constitutional difficulties is reason to reject that interpretation in favor of a reasonable, constitutional alternative, if available").
If we were to adopt the Commonwealth's argument that Johnstone was incorrectly decided and should be overruled, we would not only open the door to due process concerns but also upend a statutory interpretation that has been applied in sexual dangerousness cases for approximately ten years. The principle of stare decisis is not absolute, but "adhering to precedent is our 'preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.' " Shiel v. Rowell, 480 Mass. 106, 108, 101 N.E.3d 290 (2018), quoting Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Furthermore, an approach favoring consistency "reduces incentives for challenging settled precedents, saving parties and courts the expense of endless relitigation." Shiel, supra at 108-109, 101 N.E.3d 290, quoting Kimble v. Marvel Entertainment, LLC, --- U.S. ----, 135 S.Ct. 2401, 2409, 192 L.Ed.2d 463 (2015). Overruling precedent therefore "requires something above and beyond mere disagreement with its analysis." Shiel, supra at 109, 101 N.E.3d 290.
The principle of stare decisis is "particularly weighty" where, as here, "the Legislature has declined to exercise its authority to overturn the court's interpretation of a statute." Commonwealth v. Rivera, 445 Mass. 119, 128, 833 N.E.2d 1113 (2005). See Kimble, 135 S. Ct. at 2409 ("stare decisis carries enhanced force when a decision ... interprets a statute. Then, unlike in a constitutional case, critics of *518 our ruling can take their objections" to Legislature). The Legislature has amended portions of G. L. c. 123A two times since **307 Johnstone was decided. See St. 2010, c. 256, §§ 76-77; St. 2010, c. 267, §§ 23-28. Neither time did it amend the statute to undo our interpretation of the gatekeeping role given to qualified examiners.
The Commonwealth argues that Johnstone was incorrectly decided because no expert can be considered infallible, and the fact-finding task of evaluating sexual dangerousness must be left to a judge or a jury. The Commonwealth is correct that the law generally does not "give the opinions of experts on either side of an issue the benefit of conclusiveness" (citation and alterations omitted). Commonwealth v. Lamb, 372 Mass. 17, 24, 360 N.E.2d 307 (1977). But the Commonwealth fails to recognize that, under its approach, the benefit of conclusiveness regarding pretrial civil confinement would essentially be given to any Commonwealth-retained expert who found the person sexually dangerous, because that expert's opinion would require the person to be confined, sometimes for years, awaiting trial. In light of the liberty interests at issue, it was reasonable for the Legislature to rest the issue of pretrial confinement on the shoulders of independent qualified examiners who are "integral to nearly every step of the civil commitment process." Johnstone, 453 Mass. at 551, 903 N.E.2d 1074.
The statutory scheme established by the Legislature "condition[s] a [commitment] petition's progress on the Commonwealth's ability to provide, with increasing degrees of rigor, evidence that the defendant is sexually dangerous." Commonwealth v. Dube, 59 Mass. App. Ct. 476, 488, 796 N.E.2d 859 (2003). Implicit in such a statutory scheme is the conclusion that "dismissal of the petition is the appropriate remedy when the Commonwealth's evidence ... is demonstrably insufficient to allow it to proceed to the succeeding step." Id. As explained supra, evidence of sexual dangerousness is demonstrably insufficient where, as here, both qualified examiners have opined that the petitioner should be released from c. 123A civil confinement. See Green, 475 Mass. at 625, 59 N.E.3d 1127.
The Commonwealth argues that the holding in Johnstone"creates an obvious incentive for an offender to try to hoodwink the [qualified examiners] into offering opinions that the offender is not sexually dangerous," by, for example, exaggerating the offender's medical condition or claiming no memory of past sexual crimes. But the Commonwealth has provided no credible support for its claim that qualified examiners are so easily "hoodwinked." Qualified examiners are not novices in treating persons who are **308 alleged to be sexually dangerous; they are required by statute to have at least two years' experience with the diagnosis or treatment of sexually aggressive offenders. G. L. c. 123A, § 1. And their conclusions do not rest solely on information provided to them by the offender -- in creating their reports, qualified examiners have access to information provided by the court (i.e., records of "previous juvenile and adult offenses, previous psychiatric and psychological examinations and such other information as may be pertinent or helpful to the examiners in making the diagnosis and recommendation"), to information provided by the Commonwealth (i.e., narratives or police reports summarizing sexual offense convictions and "psychiatric, psychological, medical or social worker records of the person named in the petition in the [Commonwealth's] possession"), and to information provided by the prison or other agency with jurisdiction over the individual named in the petition (i.e., *519 incident reports summarizing what took place while the individual was in custody). See G. L. c. 123A, § 13 (b ). See also G. L. c. 123A, § 9 ("qualified examiners shall have access to all records of the person being examined").
The Commonwealth also argues that the holding in Johnstone creates the risk that sexually dangerous individuals will be released based on incorrect qualified examiner reports that are "accepted at face value" and therefore not scrutinized for "sufficient basis, reliability, or methodology." In other words, the Commonwealth is concerned that dangerous individuals could be released based on qualified examiner reports that are patently inaccurate. It is unlikely, however, that both qualified examiners, who conduct their analyses independently from one another and submit individual reports, will make errors sufficiently egregious to undermine their final conclusions whether an individual is sexually dangerous. And even if there exists some possibility that both qualified examiners will commit errors leading them to the demonstrably incorrect conclusion that an individual is not sexually dangerous, we are mindful that G. L. c. 123A "seeks to balance the dual concerns of protecting the public from sexually dangerous persons and preserving individual liberty." Commonwealth v. Gillis, 448 Mass. 354, 356, 861 N.E.2d 422 (2007). Where both qualified examiners conclude that the individual is not sexually dangerous, the balance shifts in favor of discharge.
The Commonwealth has also failed to provide any evidence that our holding in Johnstone has compromised public safety. The **309 Department of Correction has reported that of the forty-nine individuals discharged from the treatment center between 2015 and 2017 following two qualified examiners' conclusions that they were no longer sexually dangerous, only one has returned to prison, and that person was charged not with a sexual offense but with stealing a motor vehicle.[11] See Mass. juries, psychologists regularly clear sex offenders deemed no longer dangerous, record show, Boston Globe, Sept. 22, 2018, https://www.bostonglobe.com/metro/2018/09/22/mass-juries-pyschologists-regularly-clear-sex-offenders-deemed-longer-dangerous-record-show/wwLDmVynNvxwQs5J1UXerN/story.html [https://perma.cc/X4U5-QBF2]. Although we acknowledge that this data captures only a short time frame and does not reflect any potential uncharged offenses, it lends no support to the claim that persons released from civil commitment without trial based on the qualified examiners' reports remain likely to commit sexual offenses.
We therefore conclude, first, that the principle of stare decisis counsels in favor of adherence to our settled precedent; second, that the Johnstone court correctly interpreted the text of G. L. c. 123A to require evidence of sexual dangerousness based on expert testimony from at least one of two designated qualified examiners;
*520 and third, that, in doing so, the Johnstone court set reasonable limitations on the prolonged deprivation of liberty that can occur where the Commonwealth claims that an individual is or remains sexually dangerous.
Conclusion. We affirm the judgment allowing Chapman's petition **310 for discharge from civil commitment.[12]
So ordered.

We acknowledge the amicus brief submitted by the Committee for Public Counsel Services. We also acknowledge the brief submitted by the petitioners in the related case of Matter of Chapman, 482 Mass. (2019). Although we conclude in that case that the petitioners lack standing to challenge Wayne Chapman's release from civil commitment, we have considered the arguments presented in that brief that challenge the holding in Johnstone, petitioner, 453 Mass. 544, 903 N.E.2d 1074 (2009). Likewise, we have considered the arguments presented in that case by the Attorney General and by the district attorney for the eastern district, as amici.

At the time that Chapman was transferred from prison to the Massachusetts Treatment Center (treatment center), G. L. c. 123A provided that if a sentenced prisoner "appear[ed] to the sheriff [or other person] who has him in custody or to the district attorney ... to be a sexually dangerous person and in need of the care and treatment provided at the [treatment] center, such officer may notify the commissioner of mental health, who shall thereupon cause such prisoner to be examined by a psychiatrist at the institution wherein he [or she] is confined." G. L. c. 123A, § 6, as appearing in St. 1958, c. 646, § 1. If that psychiatrist concluded that the individual may be sexually dangerous, the custodian or district attorney would file a motion to commit the prisoner to the treatment center "for examination and diagnosis for a period not exceeding sixty days." Id. During this time, the prisoner would be evaluated by at least two psychiatrists, who would file with the court a report summarizing their examination, diagnosis, and recommendations. G. L. c. 123A, §§ 4, 6, as appearing in St. 1958, c. 646, § 1. If this report "clearly indicate[d]" that the prisoner was a sexually dangerous person, the Commonwealth would petition for commitment, and the court would hold a hearing to determine whether the individual was in fact sexually dangerous. G. L. c. 123A, § 6. If the court so found, it would "commit him [or her] to the center ... for an indeterminate period of a minimum of one day and a maximum of such person's natural life," or "commit such person to a mental institution or place him [or her] upon out-patient treatment, or make such other disposition upon the recommendation of the department of mental health consistent with the purpose of treatment and rehabilitation." Id.
Today, a commitment petition may be brought only in the months leading up to an individual's release from criminal or juvenile custody, and a civil commitment commences only upon his or her release from custody. See St. 1990, c. 150, § 304 (repealing G. L. c. 123A, §§ 4 -6 ); St. 1999, c. 74, §§ 3-8 (creating new procedures for sexually dangerous person determination); G. L. c. 123A, §§ 12, 14 (d ) ("order of commitment ... shall become effective on the date of such person's parole or ... on the date of discharge from jail, the house of correction, prison or facility of the department of youth services"); Commonwealth v. Chapman, 444 Mass. 15, 16 n.1, 825 N.E.2d 508 (2005).

While committed at the treatment center, Chapman pleaded guilty to charges of sodomy, open and gross lewdness and lascivious behavior, assault with intent to commit a felony (sodomy), unnatural acts with a child, and indecent assault and battery on a child. He was sentenced to from six to ten years in prison on the sodomy count, from three to five years in prison on the indecent assault and battery count, and from three to five years in prison on the unnatural act with a child count, to be served concurrently with the existing sentences for rape of a child.

The petitioner's 2007 petition for discharge was tried before a jury in 2009, who determined that Chapman remained sexually dangerous. The Appeals Court affirmed the judgment in an unpublished memorandum and order pursuant to its rule 1:28. See Chapman, petitioner, 83 Mass. App. Ct. 1105, 981 N.E.2d 232 (2013). The 2009 petition for discharge was tried before a jury in 2012, who determined that Chapman remained sexually dangerous.
Chapman's 2012 petition for discharge was tried before a jury in 2016, who determined that he remained sexually dangerous. Soon thereafter, this court held that because "a finding of sexual dangerousness must be based, at least in part, on credible qualified examiner opinion testimony," a jury must be instructed that in order to find a petitioner sexually dangerous, they must find credible a qualified examiner's opinion that the petitioner is sexually dangerous. Green, petitioner, 475 Mass. 624, 625-626, 630-631, 59 N.E.3d 1127 (2016). Because the jury who found Chapman to be sexually dangerous in 2016 had not been given this required Green instruction, Chapman was entitled to a retrial on his 2012 petition for discharge. And because Chapman had filed a new petition for discharge in 2016, his 2012 and 2016 petitions were consolidated.

Under G. L. c. 123A, § 1, the community access board is charged with "consider[ing] a person's placement within a community access program and conduct[ing] an annual review of a person's sexual dangerousness." The community access program is meant to "provide[ ] for a person's reintegration into the community." Id. As of 2014, however, it appeared that "there [was] no functioning community access program" at the treatment center. Healey v. Spencer, 765 F.3d 65, 79 (1st Cir. 2014).

An individual may be involuntarily civilly committed on an emergency basis for no more than three days, and only where a specifically-designated physician determines that failure to hospitalize the individual would create a likelihood of serious harm by reason of mental illness. G. L. c. 123, § 12. After the expiration of those three days, the individual may not be hospitalized against his or her will unless a petition for further commitment under G. L. c. 123, §§ 7 -8, is filed by the superintendent of a facility, the medical director of the Bridgewater State Hospital, or the Commissioner of Mental Health. See G. L. c. 123, §§ 7 (a ) -(b ), 12 (d ). Petitions for initial commitment brought pursuant to G. L. c. 123, §§ 7 -8, must be heard within five days of their filing. G. L. c. 123, § 7 (c ). If the hearing does not commence within that five-day period, the petition shall be dismissed unless the delay was requested by the individual or his or her attorney. See id.; Hashimi v. Kalil, 388 Mass. 607, 609-610, 446 N.E.2d 1387 (1983). The judge must render his or her decision on a petition for commitment within ten days, unless "for reasons stated in writing by the court, the administrative justice for the district court department [extends] said ten day period." G. L. c. 123, § 8 (c ).

General Laws c. 123A, § 1 defines a "sexually dangerous person" as "any person who has been (i) convicted of or adjudicated as a delinquent juvenile or youthful offender by reason of a sexual offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in sexual offenses if not confined to a secure facility; (ii) charged with a sexual offense and was determined to be incompetent to stand trial and who suffers from a mental abnormality or personality disorder which makes such person likely to engage in sexual offenses if not confined to a secure facility; or (iii) previously adjudicated as such by a court of the commonwealth and whose misconduct in sexual matters indicates a general lack of power to control his sexual impulses, as evidenced by repetitive or compulsive sexual misconduct by either violence against any victim, or aggression against any victim under the age of [sixteen] years, and who, as a result, is likely to attack or otherwise inflict injury on such victims because of his uncontrolled or uncontrollable desires."

Within seven days of receiving the petitioner's discharge application, the judge must notify the relevant parties of the date of the discharge hearing, which must be held "promptly." G. L. c. 123, § 9 (b ). During that hearing, the applicant "bears the burden of proving by a fair preponderance of the evidence that his [or her] situation has significantly changed since last his [or her] confinement was reviewed judicially, whether on the basis of new factual developments or new evidence, so as to justify his [or her] discharge or transfer." Andrews, petitioner, 449 Mass. 587, 595, 870 N.E.2d 610 (2007). If the judge finds that the petitioner is not mentally ill or that failure to civilly commit the petitioner would not create a likelihood of serious harm, the petitioner shall be discharged before the expiration of his or her commitment order. G. L. c. 123, § 9 (b ).

Although a civilly committed individual may file a petition for discharge only once per year, the Department of Correction may file a petition for discharge "at any time if it believes a person is no longer a sexually dangerous person." G. L. c. 123A, § 9.

To find probable cause that the individual is sexually dangerous, the judge must be satisfied only that "the Commonwealth's admissible evidence, if believed, satisfies all of the elements of proof necessary to prove the Commonwealth's case," and "that the evidence on each of the elements is not so incredible, insubstantial, or otherwise of such a quality that no reasonable person could rely on it to conclude that the Commonwealth had met its burden of proof" (citation and alteration omitted). Commonwealth v. Reese, 438 Mass. 519, 524, 781 N.E.2d 1225 (2003). This court has held that the judge at a probable cause hearing must exercise significant restraint when assessing the credibility of a Commonwealth expert who testifies to the individual's sexual dangerousness. Id. at 523-524, 781 N.E.2d 1225. The probable cause standard, then, allows the Commonwealth to proceed with its commitment petition so long as it can present any arguably credible expert witness who offers the opinion that the individual is sexually dangerous.

The Boston Globe reported that "[o]verall, the prison system released 180 sex offenders from civil commitments between 2009 and [2017]." See Mass. juries, psychologists regularly clear sex offenders deemed no longer dangerous, record show, Boston Globe, Sept. 22, 2018, https://www.bostonglobe.com/metro /2018/09/22/mass-juries-pyschologists-regularly-clear-sex-offenders-deemed-longer-dangerous-record-show/wwLDmVynNvxwQs5J1U XerN/story.html [https://perma.cc/X4U5-QBF2]. Of those individuals released, 105 were released prior to trial after both qualified examiners offered the opinion that they were not sexually dangerous. Id. According to the Boston Globe, the Department of Correction does not have data reflecting the recidivism rates for those individuals who were released from civil commitment between 2009 and 2015. Id.

We recognize that affirming this judgment might not result in Chapman's release from custody. In June 2018, Chapman was indicted on new criminal charges of open and gross lewdness and lewd, wanton, and lascivious conduct. The judge set bail in the amount of $ 25,000, which, according to his attorney, Chapman is unable to pay. If Chapman is convicted of these charges and subsequently incarcerated, the Commonwealth will have the option of bringing a new G. L. c. 123A petition before Chapman's release from criminal custody. See G. L. c. 123A, § 12.